American-LaFrance-Foamite Corporation v. Commissioner.
American-LaFrance v. Commissioner
Docket No. 62520.
United States Tax Court
T.C. Memo 1959-101; 1959 Tax Ct. Memo LEXIS 148; 18 T.C.M. (CCH) 447; May 19, 1959
Lawrence A. Baker, Esq., 40 Wall Street, New York, N. Y., for the petitioner. Robert S. Bevan, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax of petitioner for the years 1951 and 1952 in the respective amounts of $266,685.74 and $6,935.01. The sole issue in controversy is whether advances made by petitioner to International Meters, Inc. aggregating $506,887.06 represent contributions to the capital of that corporation or an indebtedness. If they represent an indebtedness, the respondent concedes that petitioner is entitled to *149 deduct the amount of the advances in 1951 as a bad debt. One issue relating to the amounts petitioner is entitled to deduct in 1951 and 1952 on account of liability for New York franchise taxes has been left open by the parties for disposition under Rule 50. Two other issues were raised by the pleadings, one of which, involving $9,630 received by petitioner in 1952 on the cancellation of a lease, has been conceded by the respondent and the other, involving a claimed bad debt of $9,000, has been conceded by the petitioner. Findings of Fact Some of the facts have been stipulated and are incorporated herein by reference. Petitioner is a corporation organized under the laws of the State of New York. Its offices are located at 100 East LaFrance Street, Elmira, New York. It filed its income tax returns for the calendar years 1951 and 1952 with the collector of internal revenue at Buffalo, New York. Louis F. Fink was employed as sales manager by the Standard Meter Company of Hartford, Connecticut, from 1936 to 1941. At that time all parking meters in use controlled a single parking space. While employed by the Standard Meter Company, Fink conceived the idea of using two meters on *150 one head and base to control two parking spaces, and applied for a patent covering the "plural parking space meter" (hereinafter referred to as the "twin meter"). In December 1941, Fink caused International Meters, Inc. (hereinafter referred to as "I.M.I.") to be incorporated under the laws of the State of New York with an authorized capital stock of 400 shares of no par value convertible preferred and 1,400 shares of no par value common. The Certificate of Incorporation was subsequently amended to eliminate the conversion privilege in the preferred stock but no change was made in the voting rights which entitled the holder of each share of preferred or common stock to one vote. On February 10, 1942, I.M.I. issued 600 shares of its common stock to Fink in consideration of the assignment by him to I.M.I. of the patent application covering the twin meter. On that date directors previously elected met and elected, as officers of I.M.I., Louis F. Fink, president, William F. Bleakley, secretary, and Walter G. Brown, treasurer. During the period February 10, 1942 to February 6, 1947, the directors and officers of I.M.I. were selected and controlled by Fink. During the early part of this *151 period, the application for patent on the twin meter was being prosecuted under the direction of Fink with financial assistance from the personal associates selected by him. The patents applied for were issued in October, 1944. In 1945 I.M.I. needed capital to organize and to begin to "tool up" and produce the twin meter. During that year Edward E. O'Neill (then president of petitioner) was introduced to Fink and became interested in the twin meter. At a meeting of the board of directors of petitioner held on January 16, 1946, O'Neill reported that he had been in touch with I.M.I. during the preceding eight months; that he had received satisfactory opinions from counsel on the twin meter patent; that petitioner could buy a 51 per cent interest in the stock of I.M.I., free and clear of any incumbrances, for $50,00; that this money would partly reimburse Fink for funds he had expended to advance his patent and business to that point; that the plan was to have I.M.I. operate the selling end of the business but under control of petitioner which would manufacture the twin meter; that petitioner would have to advance I.M.I. its operating expenses to start with, in an amount approximating *152 $60,000 to $70,000 per year; and that petitioner could advance this money to I.M.I. with interest or have I.M.I. issue to petitioner five per cent preferred stock, as needed, up to $100,000. O'Neill also reported on manufacturing costs, selling prices, and profits per unit and estimated that, on a conservative basis, petitioner should produce 20,000 units per year, making a profit of $160,000. On this volume he estimated that I.M.I., as the selling organization, should gross about $490,000 profit per year, less operating expenses. He further reported petitioner had been working on an experimental model of the twin meter and that it could be made to work satisfactorily with necessary changes of a minor nature. The balance sheet of I.M.I. as of December 31, 1946, showed the following assets and liabilities: Assets
Cash
$ 121.31
Accounts Receivable
673.00
Total Current Assets
$ 794.31
Fixed Assets
Machinery and Equipment
$ 864.69
Furniture and Fixtures
1,367.96
Automobile
2,035.63
$ 4,268.28
Less Reserve for depreciation
1,558.99
2,709.29
Deferred Charges
888.44
Patents
Cost
$119,591.76
Less Amortization
10,854.98
108,736.78
$113,128.82
Liabilities
Notes Payable
$ 9,000.00
Advances from American-LaFrance-Foamite
Corporation
53,983.80
Total Current Liabilities
$ 62,983.80
Deferred Credits to Income
20,000.00
Capital and Surplus
Preferred Stock (400 Shares)
$40,000.00
Common Stock (1400 Shares)
1,000.00
$41,000.00
Deficit
(10,854.98)
30,145.02
$113,128.82
*153 On February 6, 1947, an agreement was concluded between petitioner and Fink, whereby Fink agreed to sell and deliver and petitioner agreed to purchase for the amount of $50,000, (1) 400 shares of preferred stock of I.M.I., (2) 714 shares, being 51 per cent, of the common stock of I.M.I., and (3) a note of I.M.I. for $9,000 payable to Fink. Fink also agreed to grant an option to petitioner upon the exercise of which he would be required to transfer to petitioner 343 shares of common stock of I.M.I. at the end of six years from February 6, 1947, the date of the agreement, provided either of the following contingencies had occurred: (a) The death of Fink or (b) the termination of employment of Fink by I.M.I. Such option was to continue and be exercisable at any time after six years, upon the happening of either of these contingencies, upon the payment by petitioner to Fink of the book value of the stock. Fink further agreed that 343 shares of common stock held by him would be stamped to give notice of the option so granted. On February 15, 1947, the board of directors of I.M.I. authorized the issuance of additional stock and its note for $9,000, without interest, to Fink in consideration *154 for his agreement to pay all of the debts of I.M.I. in the amount of $57,140.81, making it possible for him to complete delivery required by the agreement between him and petitioner dated February 6, 1947. At the same meeting the directors elected Edward E. O'Neill, then president of petitioner, and Clarence A. Pettyjohn, then vice-president and treasurer of petitioner, as directors of I.M.I. in place of Walter G. Brown and William Nardo. On February 21, 1947, the board of directors of I.M.I. elected Edward E. O'Neill, president, and Clarence A. Pettyjohn, secretary and treasurer of I.M.I. O'Neill and Pettyjohn received no salary from I.M.I.
On February 21, 1947, petitioner entered into an agreement with I.M.I. wherein I.M.I. agreed to pay petitioner $53,983.80, the total amount of money spent by petitioner during 1946 for maintenance of the office of I.M.I., for engineering and development services on the twin meter rendered by petitioner and others, for patent and legal expenses, and for the purchase of the Clausen Patent. The agreement also provided that petitioner would "loan" to I.M.I. without interest sufficient funds to take care of the operating expenses of I.M.I. during *155 1947, such as rent, light, telephone, salaries, advertising, traveling and kindred expenses necessary in conducting its business for that year; and that I.M.I. would assign to petitioner the obligations of purchasers of the meters as collateral for sums "owed" by I.M.I. to petitioner. On February 22, 1947, the stock of I.M.I. was held as follows: Petitioner, 400 shares of preferred stock, the entire amount of such stock outstanding, and 714 shares of common stock, being 51 per cent of such stock outstanding; Edward E. O'Neill, 140 shares of common stock and Louis F. Fink, 546 shares of common stock. Although the agreement of February 21, 1947 contained no promise by petitioner to make advances to I.M.I. subsequent to December 31, 1947, the petitioner continued to advance I.M.I. all funds necessary for it to do business during the year 1948 and the first seven months of 1949. Under date of August 4, 1949, petitioner and I.M.I. entered into an agreement wherein petitioner agreed to "loan" to I.M.I., without interest, sufficient funds to take care of I.M.I.'s expenditures during the years 1948 and 1949 for "tools, dies, patterns, engineering and development work, rent, light, telephone, *156 salaries, advertising, legal, traveling and other expenses necessary in conducting its business for those years". Petitioner continued to make advances to meet the financial requirements of I.M.I. during the year 1950, which was not covered by the 1949 agreement. Under date of January 17, 1951, petitioner and I.M.I. entered into an agreement wherein petitioner agreed to "loan" to I.M.I., without interest, sufficient funds to take care of its operating and other business expenses during 1950 and 1951. In both the 1949 and 1951 agreements I.M.I. agreed to assign to petitioner its accounts receivable in payment of petitioner's advances. The 1951 agreement differed from the 1949 agreement in that each party had the right to terminate it on 30 days notice. The 1951 agreement was terminated effective August 12, 1951. However, petitioner continued after August 12, 1951, to make advances to I.M.I. The agreements between petitioner and I.M.I. required petitioner to manufacture for I.M.I. twin meters at prices ranging from 33 1/3 per cent to 20 per cent over cost. Pursuant to the agreement of February 21, 1947, petitioner made advances to I.M.I. in the amount of $53,983.80 to cover its 1946 *157 expenditures and in the amount of $98,717.20 to cover its 1947 expenditures, which resulted in total advances as of December 31, 1947, of $152,701. No accounts receivable were assigned by I.M.I. to petitioner during 1946 and 1947 since no twin meters were sold. The advances were made for the following: 1946
1947
Operating expenses
$ 9,202.32
$33,387.17
Engineering and develop-
ment
31,366.28
47,235.28
Patent and legal expenses
12,581.35
8,762.97
Tools, dies and patterns
7,602.45
Miscellaneous
833.85
1,729.33
During the years 1948, 1949, 1950 and 1951, the advances included "Cost of meters shipped" in addition to the five items listed above. The advances during those years were as follows: Year
Amount
1948
$427,814.99
1949
667,181.40
1950
713,468.17
1951
569,233.50
The books of petitioner treat the following amounts as having been repaid by I.M.I. on the advances: Year
Amount
1948
$215,517.42
1949
497,431.73
1950
712,636.31
1951
597,926.54 *
The amounts treated as having been repaid in 1948, 1949 and 1950, and $422,123.68 *158 of the $597,926.54 treated as repaid during 1951, represented the amount of meter accounts receivable assigned by I.M.I. to petitioner during those years. The books of petitioner show balances of unpaid advances of petitioner to I.M.I. at the end of each year to be as follows: Year
Balance
1946
$ 53,983.80
1947
98,717.20
1948
364,998.57
1949
534,748.24
1950
535,580.10
1951 *
575,987.08 **
During the years 1948, 1949 and 1950, and the period January 1 to October 15, 1951, I.M.I. sustained net losses of $111,676.91, $122,535.40, $42,819.15, and $6,815.65, respectively. Its balance sheets show the following assets, liabilities, and deficits: Year
Ended
Assets
Liabilities
Deficit
12/31/48
$322,292.22
$443,097.66
$120,805.44
12/31/49
368,274.74
611,615.58
243,340.84
12/31/50
365,403.93
651,563.92
286,159.99
10/15/51 *
313,849.06
586,824.70
272,975.64
*159 Prior to 1947, some handmade models of the twin meter were made by I.M.I. for experimental and testing purposes. In the latter part of 1946, tests by the engineering department of petitioner revealed that some improvements had to be made in the twin meter before it could be marketed. During 1947, I.M.I. was engaged in the improvement, development and promotion of the twin meter and was receiving assistance from petitioner in these activities. Production and delivery of meters by petitioner to I.M.I., for sale by the latter, began in 1948. I.M.I. marketed the meters through representatives with whom it had contracts. These selling representatives made contracts with customers which became effective when they were approved by the Elmira office of I.M.I. As to each contract, the amount receivable by I.M.I. was assigned to petitioner and the assignment was attached to the original contract. Purchasers of meters were billed for the contract price on I.M.I. invoices. These invoices reflected notice of assignment. Payments by the customers were received at Elmira by petitioner and deposited in the bank account of petitioner. Upon receipt *160 of such payments, the amounts thereof were applied to reduce the balance of petitioner's advances to I.M.I., and so recorded in the intercompany accounts. The petitioner experienced difficulty in reaching a profitable production level of parking meters and in 1951 initiated steps to bring about the liquidation and dissolution of I.M.I. The operating contract between petitioner and I.M.I. was cancelled by letter of July 12, 1951, effective August 12, 1951. At a special meeting of the board of directors of I.M.I. on August 6, 1951, a resolution recommending dissolution and notice to stockholders was adopted and at a meeting of the stockholders on August 20, 1951, on record vote, approval was given to the filing of a certificate of dissolution which was filed on August 28, 1951. Subsequent to the termination of the contract between petitioner and I.M.I. on August 12, 1951, and during the liquidation of I.M.I., petitioner caused all of I.M.I.'s known debts to be paid. In some instances petitioner made advances to I.M.I. to enable it to pay creditors, and in others it paid I.M.I.'s creditors directly and treated such payments as advances to I.M.I.
At a meeting of the board of directors *161 of I.M.I. on December 4, 1951, George R. Hanks, who had been elected president of petitioner on October 24, 1951, was elected president of I.M.I. Hanks reported that petitioner had assumed liability for all commissions due to sales representatives. At a special meeting of the board of directors of I.M.I. on December 5, 1951, Hanks reported on bids which had been received for the assets of I.M.I., one from The Michaels Art Bronze Co., Inc., of Covington, Kentucky, in the amount of $57,000, 50 per cent to be paid in cash and terms to be arranged for the balance, and the other a bid from petitioner in the amount of $60,000, all cash. The directors authorized acceptance of the offer of petitioner. The treasurer reported that as of December 15, 1951, all known liabilities of I.M.I. had been paid with the exception of the amount due petitioner. The treasurer was thereupon authorized and directed to pay to petitioner all the cash in the hands of I.M.I. including the $60,000 paid by petitioner as the purchase price of I.M.I. assets. Immediately prior to this payment to petitioner, the balance of advances made by petitioner to I.M.I. was $568,656.63. Application to this balance of the amount *162 of $61,769.57, which was paid to and taken from I.M.I. by petitioner, left a balance of $506,887.06 of advances made by petitioner to I.M.I. Petitioner deducted on its income tax return for the year 1951 this balance of $506,887.06 as a bad debt. The $506,887.06 balance of petitioner's advances to I.M.I. represented capital contributions and not a bona fide debt. Opinion RAUM, Judge: The petitioner contends that the unpaid balance of its advances to I.M.I. totaling $506,887.06 represented a bad debt which it is entitled to deduct under Section 23(k), Internal Revenue Code of 1939. Respondent contends that it represented capital contributions the deduction of which is limited by Sections 23(g) and 117. The question presented is essentially one of fact. Petitioner became interested in the twin meter patent owned by I.M.I. in 1946. At that time I.M.I. had only a few assets, which included the twin meter patent, some handmade models of the meter, debts, and no liquid capital. Its stock was owned by Fink, the inventor of the twin meter. It needed capital to develop, produce and market the meter. Petitioner was aware of this when, on February 6, 1947, it purchased a controlling interest *163 in the stock of I.M.I. from Fink for $50,000. In agreements between petitioner and I.M.I. dated February 21, 1947, August 4, 1949 and January 17, 1951, petitioner agreed to advance to I.M.I. sufficient funds to meet its operating and other expenses for the years 1946 through 1951, and I.M.I. agreed to assign to petitioner the obligations of purchasers of meters as collateral for amounts "owed" by I.M.I. to petitioner. No meters were sold and no assignments were made during the years 1946 and 1947. Assignments made during the years 1948, 1949, 1950 and 1951 did not equal the amount of the advances made by petitioner in those years. In 1951, when I.M.I. was liquidated, the unpaid balance of advances amounted to $506,887.06. Petitioner stresses the fact that in its books and financial statements and also in those of I.M.I. the advances were treated as loans; that they were not made in proportion to stockholdings; and that they were partially repaid. Certainly these are factors to be considered in determining whether the real intention of the parties was to create a debtor-creditor relationship. But they are not conclusive and that intention must be gleaned from the entire record. It *164 shows that the purpose of the advances was to get the business of I.M.I. established and to keep it in operation; that they were not evidenced by notes or other evidence of indebtedness; that no time was fixed for their repayment and no interest charged; that repayment was contingent upon the success of the business of I.M.I. and the possibility that the amount of its contracts assigned to petitioner would eventually equal the amount of the advances; and that I.M.I. sustained net losses and had mounting deficits during the period covered by the advances. We think that the advances made by petitioner were intended to be subject to the risks of the business and not repayable in any event. Although the matter may not be completely free from doubt, it is our best judgment on the entire record that the advances were capital in nature and did not create debts. Accordingly, the deduction for worthlessness of petitioner's investment must be governed by the provisions relating to capital assets rather than by the bad debt provisions. Decision will be entered under Rule 50. Footnotes
*. Includes amount of $60,000 received upon dissolution of I.M.I.↩
*. October 15, 1951. ↩
**. This balance at October 15, 1951, was subsequently adjusted between October 15 and December 17 so that immediately prior to complete liquidation the balance was $568,656.63. Application of cash, the sole remaining asset, amounting to $61,769.57 reduced the balance to $506,887.06.↩
*. Period January 1 to October 15, 1951.↩